# WISCONSIN REPORTS. 79

School District No. 3, and Others, vs. Malcoon, et al.

SCHOOL DISTRICT NO. 3, AND OTHERS, Complainants and Appellants.

*vs.*

WILLIAM MACLOON, et al., Defendant and Appellant.

APPEAL IN EQUITY FROM ROCK CIRCUIT COURT.

School districts in this state are *quasi* corporations, and may sue and be sued in their corporate names.

A school district does not become dissolved, or lose any of its rights, or become discharged of its obligations, by a change of its name.

A school district is not dissolved by being divided, but retains all its rights as a corporation of that nature.

A parol contract for the purchase of land, will be enforced, where part (one-half) of the purchase money has been paid, possession taken, and valuable and permanent improvements made by the vendee.

A third person who purchases with notice of the outstanding contract, does so, subject to all the equities growing out of the contract, and will be in no better condition than the original vendor.

The complainant may, in the discretion of the court, be allowed to amend his bill after the hearing, where such amendment will not prejudice the rights of other parties.

THIS was a bill for specific performance filed in the Rock Circuit Court, by school districts Nos. 3, 9, 10 and 11, of the city of Janesville. The bill states that in the month of March, 1845, A. Hyatt Smith, Wm. H. H. Bailey, and Lewis E. Stone, were seized as tenants in common of a large number of lots in Smith, Bailey, and Stone's addition to Janesville, and were citizens of said Janesville; that school district No. 7 was duly organized on or about the 18th day of March, 1845, and that on the 1st day of June next ensuing, said district No. 7, by its lawful officers and agents, entered into negotiations with said Smith, Bailey, and Stone, or some of them, for the purchase of lot No. 156, for a site for a school-house for said district; that while such negotiations were pending, the said Smith, Bailey, and Stone gave out and caused said officers to believe that by legal conveyance, unrecorded, Stone had become the sole owner of said lot; that so believing, the said officers with the full knowledge and consent

of Smith and Bailey, entered into a verbal agreement. with Stone for the purchase of said lot; that by the said contract, Stone agreed that if said district would pay him within a reasonable time the purchase money for said lot, he would convey the same to said district in fee simple; that about the 17th day of May, 1845, the said district, in pursuance of said agreement, paid said, Stone $17.46, for which Stone gave a receipt; that the complainants are not informed of the precise sum agreed to be paid for said lot, but that it did not exceed $30; that in April, 1845, relying upon the faith of said agreement, the said district took possession and commenced erecting a brick building thereon, to be used and occupied as a school-house, which was ready to be used as such in June, 1845, and continued to be used as such until about the year 1851; that the cost of said building and improvements was over $300, and together with said lot was held and occupied under said agreement with Stone as the sole and exclusive property of said district, subject only to a claim for the balance of the purchase money until 1851.

The bill further states, that about the 8th day of June, 1846, a deed of release and quit claim, without covenants, bearing date the 5th day of March, 1845, executed by Stone to Smith and Bailey, conveying to them all of the interest of Stone, in and to said lot 156, together with a large number of other lots in Smith, Bailey and Stone's addition, was recorded in the office of the register of deeds for said county of Rock; that until the recording of said deed, the said district, its officers and agents, had no notice of the existence of said conveyance, but Smith and Bailey permitted the said district to use and occupy said lot without interposing any claim or objection, and permitted them to go on and expend large sums of money in the erection of the brick building aforesaid, under their immediate observation, without giving any notice of such deed, or claiming any interest in said lot.

The bill further alleges that the said district was at all times ready and willing to make provision for the payment of all just claims and demands against said district, and from time to time gave public notice of meetings called for the purpose of making such provision; but neither Smith, Bailey nor Stone attended such meetings, nor present any claims for payment at any such

meeting; that Macloon had been a resident and legal voter of said district for several years, and had often been chosen an officer therein, and was present at a meeting in 1849 when the district board was instructed to sell said lot; that in 1851 the name of said district was changed to No. 3, and in 1852 the said district was divided into four districts, severally designated as Nos. 3, 9, 10 and 11, and that said lot 156 is in district No. 9.

That while the said premises were in the undisputed possession and occupancy of said district, Bailey and wife quit-claimed their interest therein to Smith, and that in March, 1851, Smith and wife, and one Doe and wife, by deed of quit-claim and release, without covenants, conveyed to Macloon, who soon after took exclusive possession of said lot and the building thereon, and claimed to be the sole and exclusive owner thereof by virtue of the conveyance to him from Smith as aforesaid, denying all right, interest and claim of the said school district No. 7, No. 3, or any other district whatsoever, in said lot or the building thereon, and continues to hold sole and exclusive possession.

The bill further charges that Macloon knew all of the rights and interests of the complainant, and was well aware of all the transactions of said district and districts in relation to said lot, and was expressly informed by Smith at and before the conveyance to him of the nature of Smith's title, that Macloon has frequently refused, and still does refuse to receive the balance of purchase money, if any there be, due on said lot, and that Stone had refused, and still does refuse to execute the agreement before mentioned.

In their prayer for relief the complainants ask the court to determine that Smith and Bailey adopted the agreement made with Stone, by district No. 7, as their own; and that Macloon acquired no other or greater rights or interest in the said lot 156 by receiving the deed from Smith and wife and Doe and wife, than they possessed or were entitled to at the time of making the deed; and that said Macloon is bound in equity to convey the said lot 156 to said school district No. 9, on receiving the balance of the purchase money; and that Smith, Bailey & Doe are estopped from setting up any claim to, or interest in the said lot 156; and that while they were so estopped, they could not convey any right, title or interest in the said lot No. 156.

And also, that the said William Macloon may be decreed specifically to perform the said agreement, made by said district No. 7 and the said Lewis E. Stone, by releasing to said district No. 9 said lot No. 156; at the same time averring readiness and willingness, and offering specifically to perform for the use and benefit of said Macloon all the agreements entered into by the said district No. 7 with the said Lewis E. Stone; and a further prayer that the said deed from the said Lewis E. Stone to the said Smith and Bailey, and the said deed from the said William H. H. Bailey and his wife to the said Smith, and the said deed from the said A. Hyatt Smith and his wife and the said Joseph B. Doe and his wife to the said William Macloon, may each and every one of them be declared fraudulent and void as to the said complainants, and that thereupon the said Lewis E. Stone may be decreed specifically to perform the said contract so as aforesaid entered into by and between the said Stone and said school district No. 7, by releasing to said school district No. 7 all claim upon lot 156; and that Smith, Bailey, Stone, and all other persons, be forever barred from having or setting up any claim to the said lot. And in case the said Macloom and the said Stone, or either of them, are unable and cannot be decreed specifically to perform the said agreement so made and entered into by and between said Stone and said district No. 7, then and in that case the said William Macloon may be decreed to pay school district No. 9 the amount of money so expended in erecting and improving the building on said premises, together with the said sum of seventeen dollars and forty-six cents, paid by said district No. 7 as part of the purchase money for said premises, and the legal interest thereon, &c.; to which is added the usual prayer for general relief.

The foregoing bill of complaint was taken as confessed by all the defendants except Macloon, he being the only defendant whose interests are in any way affected by the decree.

Macloon answered denying all the material allegations of the bill.

The evidence produced on the hearing is sufficiently stated in the opinion of the court.

The court below deeming the bill defective in regard to several allegations, permitted the same to be amended, and when so

School District No. 3, and others, vs. Macloon et al.

amended, entered a decree for specific performance, or rather decreed Macloon to release and convey upon the following conditions:

"The amount of money to be paid for Smith and Bailey's tax, in erecting the school-house, as the purchase money of said lot after deducting the amount paid Stone, and which in his account with Smith and Bailey came into their hands, is to be taken as fixed at $27.00, upon which I think interest should be assessed at the highest legal rate, and which would make the amount of the purchase money due when Macloon six years after took possession, the sum of $46.44; that he is entitled to be assessed that sum with the interest thereon at the same rate; that as the district has failed to tender that sum before bill was filed, I think they should not be entitled to costs, but costs should be allowed to the defendant, Macloon; that the matter be referred to a commissioner to take an account of the rents and profits; that the defendant, Macloon, should be charged with their fair value, over and above the taxes and ordinary repairs; and also to take an account of the value of any permanent improvements upon said lot made by Macloon; and that upon the coming in of his report and the confirmation of the same, and ascertaining the balance due to Macloon, if any, for the purchase money so found due, with interest thereon, and the value of his improvements over and above the rents and profits, and upon the payment of his costs to be taxed, that he be decreed to release and quit-claim to said district the lot in question; that if either party wishes to appeal, the amount of bail is fixed at $250."

*Noggle*, for the complainants, appellees.

*Whiton & King*, for the defendant, appellant.

*By the Court*, COLE, J. This is a bill for a specific performance of a contract, filed by school districts Nos. 3, 9, 10 and 11 of the city of Janesville, against A. Hyatt Smith, William H. H. Bailey, Lewis E. Stone and William Macloon. The bill is taken as confessed by all the defendants except Macloon.

The first question to be considered is the right of these complainants to maintain this action. It is insisted, by the appellant, that the complainants have not shown, by their bill, that they

were legally formed out of the identical territory embraced in school district No. 7, and have the same right to a specific performance of the contract mentioned in the bill that that district would have had, had it retained its original name, and never been subdivided into the other districts. The bill states that school district No. 7, of the town of Janesville, was organized as a school district, according to law, about the 18th day of March, 1845; and that, immediately thereafter, the said district, by its lawful officers, entered into an agreement with Stone for the purchase of lot 156 of Smith, Bailey & Stone's addition to Janesville for a school-house site, supposing, from the representations of Smith and Bailey, that Stone had become the sole owner of said lot; that, by said agreement, the officers of said district agreed to pay Stone, within a reasonable time, a sum not exceeding thirty dollars for the lot; and that, in consideration thereof, Stone agreed to convey to said school district No. 7 the said lot in fee simple. It further states that the district paid Stone $17.46, part of the consideration money, for which he gave a receipt; entered upon and took possession of the lot; erected thereupon a brick school-house, which was used and occupied as a school-house by the district until 1851, when it was taken possession of by the appellant, under a deed from Smith and Doe. Further, that some time between the annual meetings of said district for the years 1850 and 1851, the name of the district was changed by the town superintendent from No. 7 to school district No. 3; and that, some time in 1852, the said district No. 3 was subdivided by the same officer into the four districts which have filed this bill. And that the lot 156 is situated in district No. 9; that No. 9 is now, and has ever been, ready to pay over to the other districts whatever the town superintendent shall determine to be the proportion of the value of the school-house and property justly due districts Nos. 3, 10 and 11. That is all of the bill necessary to be stated, to understand and dispose of the objection made to the frame of the bill. The averments that the complainants are formed out of the same territory originally embraced in school district No. 7, are sufficient. It says that school district No. 7 changed, some time between the annual school meetings of 1850 and 1851, to school district No. 3; was subdivided in the following year into the school districts Nos. 3,

9, 10 and 11. No other inference can fairly be drawn from this language, than that the complainants embrace the same territory first comprised in district No. 7. That fact is succinctly, yet plainly stated, and with all necessary and convenient certainty, as to the time and manner the change in the districts was made. Neither did those districts lose any rights under the agreement made with the owners of the lot, by the change of name in the first instance, or the subsequent subdivision. The appellant contends that a dissolution of school district No. 7 resulted from one or both these acts; and we have been referred to several authorities to show the effect of a dissolution upon the rights of the corporation. There would be pertinency in the law cited, when the position is established that school district No. 7 was dissolved, and all its rights extinguished and lost. But that proposition has not been, and cannot be, successfully maintained. School districts, by our laws (*Sec.* 8, *chap.* 19, *R. S.*), are corporations for certain specified purposes; and their names can be changed, and their boundaries altered, without losing any right, or becoming released from any obligation. Even at common law, *quasi* corporations might change their names, and alter their boundaries, without working a destruction of their rights and franchises, or canceling their duties and liabilities. In our statutes (chap. 19), ample power is given the town superintendent to describe and number school districts (*section* 43); and, with the chairman of the town Board of supervisors and town clerk (*section* 59 *et seq.*), to alter them at pleasure. Section 61 requires that the town superintendent should, when a new district is formed, in whole or in part, from one or more districts, possessed of a school-house or entitled to other property, ascertain and determine the proportion of the value of the school-house and other property justly due to such new district. It does not appear, from the bill, whether this was done or not; nor was it necessary that the bill state that fact. School district No. 9 avers its readiness to pay whatever sum the town superintendent shall have determined, or may determine, as due the other districts, in consequence of this lot and house becoming the sole property of that district; and should it refuse to pay the same, there would be no difficulty in those districts collecting it in the mode pointed out by statute. That matter has nothing to do with this

suit. If a specific performance of this contract shall be enforced, the decree will enure to the benefit of all the complainants. Having disposed of these preliminary questions, we are now to consider what contract was originally made by the officers of school district No. 7, with the owner or owners of lot 156, and whether the equities of the case are such as to require its specific enforcement against the appellant Macloon. The testimony proves, beyond all doubt, that some contract for the conveyance of the lot to the district was entered into between the officers of the district and Smith, Bailey & Stone, or some one of them. Taylor and Stone, witnesses for complainants, and Smith and Bailey, witnesses for the defendant, all testify to a contract for selling the lot to the district, but differ as to its conditions, and when it was made. Taylor, who was a trustee of the district, at its first organization, early in the year 1845, testifies that he, with Holmes, another trustee, went with Bailey and selected lot 156 for a school-house site. They agreed with him about the price, which he thinks was thirty dollars; Bailey agreeing to wait for his pay until the money could be raised by the district. At this time, Smith and Bailey owned this lot; Stone having quit-claimed his interest to them on the 5th of March, 1845; but the deed remained unrecorded until the 8th of June, 1846. There is nothing to show that the district had any knowledge of the existence of this deed until it was put upon record.

Stone testifies that Bailey came to him and said that he had sold the school district on the west side of the river, a lot for a school-house site, and that the lot selected in their division belonged to witness, and asked witness if he would stand by the sale; to which he replied, he would. Soon after this he secured from the district, as part payment for the lot, between $17 and $18, afterwards ascertaining when the district began to build the school-house that the lot was Smith and Bailey's, and not his. In his next settlement with them he accounted for the money secured from the district, informing them of it, and that the lot was theirs. He further testifies that he ratified the sale made by Bailey while under the impression the lot was his, but that he never made any contract with the officers of the district about it.

Bailey is not so clear in his recollection of events. He testi-

fies that some one applied to him for a lot for a school-house site, after the erection of the house was commenced, and he told them the district could have the lot for that purpose, upon condition of exonerating him and Smith from all taxes they might become liable to pay for building the school-house. Although he does not expressly say so, yet he would have us understand that some one competent to bind the district, assented to and made this agreement. After the house was built, a demand was made upon him and Smith by the collector of the district for their tax, which he paid under protest. .

Smith testifies in substance to the same contract, and states most distinctly that the officers of the district agreed to it.

These different statements of the witnesses in regard to the contract, are widely variant and inconsistent upon the supposition that but one contract was made about the purchase of the lot, and can only be reconciled upon the idea that there were two; the one testified to by Taylor and Stone, and a subsequent one testified to by Smith and Bailey; and the latter view of the case is the ground upon which it was considered by the court below. That certainly was the most favorable view that could be taken for the appellant, and since the appellees do not complain of the decree rendered, we will adopt the same conclusion, although, were the examination imposed upon us, our appreciation of the proofs by which this conclusion is sustained, might differ from that of the Circuit Court. Conceding, then, that there were two contracts about the purchase of the lot, and that the one testified to by Taylor and Stone was abrogated or abandoned by the one subsequently made; is the latter of such a character that a specific performance of it should be enforced against the appellant Macloon?

And in the first place it is to be observed that Macloon is not entitled to protection as an innocent *bona fide* purchaser without notice. No one, we think, would seriously contend for that. For it is in evidence that he was accustomed to attend the school meetings in that house; that he participated in the proceedings of those meetings—knew the district had been in possession of the lot for years before he received the deed—and was fully apprized of all that had taken place in reference to it. His conveyance was taken, then, subject to all the equities existing be-

tween the district and his grantors; and, if a specific performance of the contract should be enforced as to them, it should be against Macloon. How, then, is it as to his grantors? It requires but little more than a brief statement of the facts of the case to give a sufficient answer to this question.

In the spring of 1845 Smith and Bailey owned a large number of lots on the west side of the river in Janesville, among which was the one in controversy. They were accustomed to make sales as opportunity offered, each one invariably ratifying the sales made by the other. Bailey made most of the sales. He was applied to by the trustees of school district No. 7 for a lot for a school-house. He went with two of them and selected it; agreeing upon $30 as the amount to be paid for it, and to wait for his pay until the district could raise the money. Although Smith and Bailey then really owned the lot, yet the officers of the district were given to understand by some one during the negotiations, that the lot was Stone's. Who was responsible for this mistake does not satisfactorily appear, and it is not material to inquire. We presume it was Bailey; indeed, have but little doubt about it. However that may be, the officers of the district, supposing the sale was all right, entered into possession of the lot. They built a valuable brick school-house upon it. They paid Stone $17.46, part of the consideration money, supposing he was the owner. This money was paid over by Stone to Smith and Bailey, or accounted for in his settlement with them. While the house was being built or after it was built, it was discovered that it was upon a lot belonging to Smith and Bailey instead of Stone. Another contract was made by which the district was to have the lot upon condition of exonerating Smith and Bailey from all taxes they might become liable to pay towards building the house. Subsequently these taxes were collected, amounting to forty or fifty dollars. The district continued in possession of the lot from the spring of 1845 until 1851. In the meantime the value of the lot is greatly increased. Less than $30 and interest remained due and unpaid, but no claim was ever made by any one against the district for it. Bailey, when he sold the lot, owned one-half and had authority to sell the other half. They were both citizens of Janesville, living in the vicinity of the house, knew when it was being

built, and paid taxes for it. They leave the district in the quiet and undisturbed possession of the property for six years. And this possession is not contested until a day or so before the deed is given to Macloon. Then Smith makes claim to the lot, the title having become vested in him; or rather, when called upon to pay a tax in the district of $113, offers to convey the lot upon being released from the payment of this tax. The district did not accept the proposition, whereupon he deeds the lot to the appellant.

Under these circumstances there can be no doubt but the principles of fair dealing and the rules of law require that the contract should be enforced against Smith. It would be grossly inequitable to suffer the district to be turned out of the possession of the lot, lose the benefit of the improvements, the rise in the value of the property, because it had neglected to pay the small sum above stated. In reply to this it is said, that the district has been guilty of gross laches in not paying the money before and applying for the deed. Undoubtedly the district has been in default about paying the money. But we all know how loosely the affairs of school districts are managed. The officers generally change every year, the records are imperfectly kept, and it is often difficult, after a little lapse of time, to ascertain the real liabilities of districts. In this case there might be some excuse for the non-payment of the balance due on account of the change of the title, and the uncertainty as to who owned the lot. Moreover, Smith and Bailey were dealing with a school district, and should have brought their claim to the attention of the citizens of the district by presenting it at some school meeting. Had the district refused to pay, the money could have been collected by law. The district had acted upon the good faith and binding effect of the contract, and could not abandon it.

It is objected that the contract is too vague and uncertain to be enforced; but this objection is not well taken. The contract set forth and proven is most clear and explicit in its terms. The district was to have the lot upon condition of releasing the owners from all tax for building the school-house, and that tax, afterward collected, amounted to forty or fifty dollars.

Upon the hearing, the contract proven by the defendants

Smith and Bailey, being in some respects different from the one set forth and relied upon in the bill, and the equity of the case being very clear, for the furtherance of justice, the court permitted complainants to amend their bill so as to make the allegations correspond with the proofs. It is not by any means indisputable that an amendment was necessary in order to entitle the complainants to the relief prayed; at all events, the amendments made were not so material as to prejudice the rights of the defendant. The court, having the whole case before it, and being embarrassed in its decision by what it deemed defective allegations in the bill, could, in its discretion, permit the amendments to be made under the peculiar circumstances of the case.

The decree of the Circuit Court is therefore affirmed.