PHILLIS, Appellant, v. GROSS (BOST, Intervener,) Respondents.

(143 N. W. 373.)

1. **Vendor and Purchaser—Bona Fide Purchaser—Unacknowledged Bond for Deed.**

A bond for deed, not acknowledged so as to entitle it to be recorded, but which was actually recorded, was not constructive notice to subsequent purchasers, of the rights of the bondholder, though any one who saw the record would be charged with knowledge of the rights of holder thereof.

2. **Vendor and Purchaser—Bona Fide Purchaser—Presumption of Notice.**

It will not be presumed that purchasers of land had actual notice of a recorded but unrecordable deed, theretofore executed by the former owner, or that they actually saw the record, in absence of evidence to that effect.

3. **Appeal—Findings—Conclusiveness.**

A finding by trial court will not be disturbed unless against the preponderance of evidence, and is conclusive on appeal if the evidence is conflicting.

4. **Vendor and Purchaser—Purchaser From Bona Fide Purchaser—Effect of Actual Notice.**

One conveying land to a bona fide purchaser, without notice of a bond for deed theretofore executed by a former owner, and repurchased the land from his grantee, took the title back subject to the knowledge he had of the bond when he first conveyed, though his said grantee took it free from the rights created by the bond.

5. **Vendor and Purchaser—Bona Fide Purchaser—Effect of Possession.**

The possession and use of land, by pasturing all but a small portion of it which was cropped from year to year, which was the ordinary manner in which it and the possessor's other nearby land was used, during the seasons of 1906 and 1907, and the leasing of the cultivated part during season of 1908, were sufficient to put prospective purchasers on inquiry as to extent of the possessor's rights, and one purchasing without inquiry did so at his risk.

6. **Vendor and Purchaser—Bona Fide Purchaser—Notice.**

Where the acts of a vendee under an unrecorded contract are such that reasonable inquiry would reveal his possession, a subsequent purchaser is charged with notice of such vendee's rights.

7. **Abandonment of Rights—Question of Law.**

An abandonment of rights under an instrument, is a question of fact, and not of law.

**8. Abandonment—Intention to Abandon.**

Abandonment of a right includes both an intention to abandon, and the act making effectual such intention, and the mere fact of non-user for a time would not authorize a finding of abandonment.

**9. Vendor and Purchaser—Construction of Contract—Time of Conveyance.**

Although the printed part of a bond for deed provided that it was expressly understood between the parties that time was of the essence of the contract, and that failure to comply therewith by purchaser would warrant forfeiture of his rights, yet, as its written part provided that all sums overdue should draw interest after maturity, and if interest was not paid annually, it should become as principal and bear the same interest, held, time was not of its essence.

**10. Contracts—Time of Performance—Time as Essential—Intention of Parties.**

Whether time is to be considered as of the essence of a contract depends upon the intention of its parties and the object to be attained thereby, rather than upon their express declaration therein.

**11. Vendor and Purchaser—Bond for Deed—Relative Interests of Vendor and Vendee—Relative Rights.**

Upon execution of a bond for a deed to land already purchased, the purchaser becomes the equitable owner, with all rights of absolute ownership, except the legal title, which is held by vendor as security for the price, leaving the relation between the parties that of creditor and debtor, the vendee having an equity of redemption, the vendor a correlative right of foreclosure on default in payment, and hence vendor could not oust purchaser until his equitable estate had been divested by foreclosure, nor maintain an action to quiet title against purchaser.

**12. Wills—Title of Devisee.**

The devisee of land takes no greater right in the premises than that of the testator therein.

(Opinion filed Oct. 23, 1913. Rehearing denied Dec. 5, 1913.)

Appeal from Circuit Court, Potter County. Hon. J. H. Bottum, Judge.

Action by Elmina E. Phillis against Robert A. Gross, to quiet title; in which Oscar D. Bost intervened. From a decree for defendant and intervener, and from an order denying a new trial, plaintiff appeals. Reversed and remanded for further proceedings.

*Fisk & Sargent,* for Appellant.

Possession of real estate is notice of the possessor's title.

By reason of the open, notorious, unequivocal possession of Edgerton of said land, the defendant Gross was charged with notice that Edgerton was the owner—equitable if not legal— of the land, or was chargeable with notice of all of the rights that Edgerton had therein. Allen v. Cadwell, 20 N. W. 692-695; Lestrade v. Barth, 19 Cal. 660; Crooks v. Jenkins, 100 N. W. (Ia.) 82; Rodgers v. Turpin et al., 74 N. W. (Ia.) 925; Dewey v. Ingersoll, (Mich.) 3 N. W. 235; Code Civ. Proc., Sec. 48.

Such possession precludes anyone from being an innocent purchaser as to such possessor. Jones v. Wilkinson, 42 Pac. 735; Bank v. Allen, 86 N. W. 383; Peterson v. Phil. Mort. & T. Co., 74 Pac. 585; Norman v. Bennett, 9 S. E. 914; and this is so though there is no record evidence of his right of possession. Turman v. Bell, 15 S. W. 886.

A purchaser of land in the possession of a stranger will be presumed to have knowledge of the possession, if it is of such a character that it is visible and notorious. McCaul v. Yard, 11 N. J. Eq. 58.

Open, notorious and exclusive possession of land under an unrecorded contract for the purchase thereof, or under an unrecorded bond for title is constructive notice to subsequent purchasers or incumbrancers thereof, of the possessor's interest therein, and of the character and extent of his claim. Corey v. Smalley et al., 64 N. W. 13, and cases cited; Allen v. Cadwell, 20 N. W. 692; Bartlett et al. v. Smith, 109 N. W. 260; Lipp v. Hunt, 41 Neb. 143; School Dist. No. 3 v. Macloon, 4 Wis. 79; Betts v. Letcher, 1 S. D. 182.

The notice communicated by possession is not affected by the fact that the second vendee did not know of the character of the contract under which the first took possession, nor by the fact that the subsequent purchaser had no actual knowledge of such possession. Brewer v. Brewer, 19 Ala. 481; Hamilton v. Fowlkes, 16 Ark. 630; Royce v. Flint, (N. Y.) 1 Alb. L. J. 238; Bell v. Flaherty, 45 Miss. 694; Harris v. Bell, 10 Serg. & R. 39.

Edgerton was in possession of the land under his bond for deed for four years after the making of the bond for deed before Chamblin attempted to transfer the land to any person, and

during that four years, seven of the ten payments which Edgerton contracted to make upon the land, matured, but Chamblin did nothing whatever to foreclose or forfeit Edgerton's rights under the contract.

About three and a half years elapsed between the time that Chamblin made a deed to Campbell and the time that Gross received a deed for the land, and during those three and a half years none of the persons who held deeds to the land disturbed, or made any objection to, Edgerton's continued possession.

A little less than two years after the deed from Gross to Sell, Sell made a deed back to Gross, and yet Gross did nothing to disturb Edgerton in his possession, or to ascertain Edgerton's right to possession.

On November 8, 1907, Gross made a deed of the land to Fred Zessin, and Zessin allowed Edgerton to remain in possession, and allowed Henry Eyhusen, to whom Edgerton leased the cultivated portion of the premises for 1908, to go upon the premises peaceably and put in his crop in the spring of 1908.

The evidence is insufficient to sustain the decision.

The evidence of plaintiff shows clearly and without contradiction, that Edgerton was in possession of the land in question continuously from the date of his bond for deed with Chamblin in 1898 until his death, June 5, 1908, and that he made use of the land for his ordinary uses—cultivating and improving the broken portion and herding and pasturing his sheep, and those in his possession as an agister, upon the uncultivated portion, according to the usual course and custom of the adjoining country.

The bond for deed is a printed from filled out and executed by the parties, containing important provisions inserted in writing by the parties at the time of the execution.

The trial court lost sight of and failed to consider the manner in which the bond for deed was made, and the stipulations specifically inserted therein by the parties. The parties provided, by special written stipulation, that Stoughton P. Edgerton should make certain payments with interest, (according to the printed portion), at the rate of six per cent per annum from maturity annually on the whole sum remaining from time to time unpaid. According to the blank used, the provision would have ended with "unpaid" and would have provided for the payment

of interest anually or semi-annually instead of "from maturity,"
but the parties did not agree to the printed provision, and added
thereto, after the word "unpaid," the following: "And if the
interest be not paid annually to become as principal and bear the
same rate of interest." This written provision takes precedence
over the printed portion of said contract, that time shall be of the
essence of the contract, and that the contract may be forfeited in
the event of the non-payment of said sum of money, or any part
thereof, and shows plainly that it was the intention of the parties
that the only penalty upon Edgerton for his failure to pay at the
times named would be the payment of interest on the past due
amounts, and that it was not the intention of the parties that the
contract should be forfeited upon the non-payment of any sum
of money becoming due.

Defendant offered no testimony whatever as to either the
payment or the non-payment of money under the bond for deed.
On the maxim *omnia praesumunter recte esse acta*—that will be
presumed to have been done which ought to have been done—
the plaintiff claims that it must be presumed in the absence of
proof to the contrary, that Edgerton made the payments which
he was required to make under the terms of his bond for deed
with Chamblin, the time for the making of the payments having
long since gone by, and Edgerton having remained in possession,
undisputed by Chamblin and those who now claim to hold under
him. Burling v. Patterson, 9 C. & C. 570; R. v. Benson, 2
Camb. 508; Bruce v. Nicolopopulo, 11 Ex. 129; Rugg v. Rings-
mill, L. R.; i Ad E. C. 343; R. v. Manwarring, 26 L. J. M. C.
10; R. v. Upton, 10 B. & C. 807; R. v. Steinforth, 11 Q. B. 66.

*Gaffy, Stephens & Fuller*, for Respondents.

The defendant Gross purchased in 1905 for value without
notice, and his title free of adverse claims passed to defendant.

The most that can be said for the plaintiff is, that there is
a conflict of testimony as to the possession of these premises in
that year.

If anyone of the holders of this title, from Chamblin down,
took the same for value without notice of Edgerton's claim, his
title was perfect and passed in unclouded condition to every sub-
sequent purchaser. 39 Cyc., p. 1772; Pom. Eq. Jur., Vol. II.,
Sec. 622.

The presumption of notice from possession is not conclusive. Pom. Id., Secs. 607, 624.

Gross, the defendant, when he first purchased the land, exercised all reasonable diligence. He went upon the premises, and we submit that there was absolutely nothing observable which could put a prudent man upon further inquiry or research than he made.

Dominion must be manifested by such open and notorious acts of ownership as will naturally be observed by others, and the acts must be of a character so certain and definite in denoting ownership as not to be liable to be misunderstood or misconstrued. Pom. Id., Sec. 620, note 1 (a) p. 1036; Hodge v. Amerman, 40 N. J. Eq. 99; Betts v. Letcher, 1 S. D. 194.

Where the land is open and unfenced, mere grazing of cattle, horses, etc., over the land is not sufficient to show actual possession, and this is especially true where claimant used no methods to restrain the live stock to any particular land. Am. & Eng. Ency. of L., Vol. 2, p. 375, et seq.

Could any manner of decree be entered for plaintiff?

No proof was made of an attempt to comply with a single provision of this contract at any time, and no tender or offer alleged or proven. The plaintiff came into equity, but rather than offer to do equity she seems to await the requirements of the court in that particular. Even it it can be equitably presumed without proof, that Edgerton had complied with his contract, such presumption cannot aid the plaintiff under the facts of the case. This presumption would mean the last payment made in January, 1903. Plaintiff's testator would then become obligated in equity to act with reasonable promptness in procuring and recording his deed, that others may not be misled.

Can any arbitrary rule be asserted by which the onus is placed upon defendant to prove that the vendee did not comply with the contract?

While mere non-user does not alone establish abandonment, Edgerton's intention to abandon is shown by non-user and failure to make a visible sign of occupancy and claim under the equities arising from the circumstances of the case. He was bound to make his notice good by record or actual possession. His failure to perform so obvious a duty implied his intention to abandon.

POLLEY, J. This is an appeal by the plaintiff from a decree for defendants and an order denying plaintiff's motion for a new trial. The action was brought by plaintiff for the purpose of having quieted in her the title to a quarter section of land in Potter county. On and for some time prior to the 17th day of March, 1898, one C. E. Chamblin, of Mason county, Ill., was the owner of the land, as patentee from the United States government. On said date he executed a "bond for deed" to one Stoughton P. Edgerton. This instrument was made out on a printed form, with blanks to be filled in to make it conform to the conditions agreed upon by the parties. The material portions of said agreement, with the written parts in italics, are as follows:

"* * * The condition of the above obligation is such, that, whereas, the above bounden *C. E. Chamblin* has this day sold to the said *Stoughton P. Edgerton,* his heirs and assigns, for the sum of $582.50, all of the following described lot, piece or parcel of land, to-wit: *S. E. ¼ of Sec. 13, T. 117, R. 76, situated in Potter county and state of South Dakota,* which sum of $582.50 is to be paid in the manner following: *Ten notes, dated July 1, 1898, payable as follows, to-wit,*" one on the 1st day of January, 1899, and one every six months thereafter until the 1st day of July, 1903, "with interest at the rate of *6%* per annum *from maturity* annually on the whole sum remaining from time to time unpaid, *and if the interest be not paid annually to become as principal and bear the same rate of interest.*

"Upon the payment of the said sums being made at the time and in the manner aforesaid and of all taxes, assessments or impositions that may be legally levied or imposed upon said land for and after the year A. D. 1897, the said *C. E. Chamblin, his* heirs, executors and assigns, covenants and agrees to and with the said *Stoughton P. Edgerton, his* heirs, executors, administrators and assigns to execute a good and sufficient deed of conveyance, in fee simple free from all incumbrances, with full covenants and warranty, for the above described premises.

"Now, if the said *C. E. Chamblin* shall well and truly keep, observe and perform his covenants and agreements herein contained on *his* part to be kept and performed, then this obligation to be void; otherwise to remain in full force and virtue. It is expressly understood and agreed by and between the parties hereto,

that time is of the essence of this contract, and, in the event of the nonpayment of said sum of money ,or any part thereof, or the interest thereon, at the time or times herein named for its payment, that then the said *C. E. Chamblin, his heirs, executors, and administrators, and assigns shall be* absolutely discharged at law and in equity from any and all liability to make and execute such deed."

This instrument was not acknowledged by the said Chamblin, but it was filed for record on the 6th day of May, 1902, and was recorded in Book of Miscellaneous Instruments in that office.

The said Edgerton, at the time of the execution of the said instrument and until his death, which took place on the 5th day of June, A. D. 1908, resided on a quarter section of land, just half a mile north of the one in controversy. He farmed some, but was principally engaged in stock raising—having a large flock of sheep of his own—and also acted as an agistor for the purpose of pasturing sheep for others. The evidence tends to show that he went into possession of the land in controversy about the time of the execution of the above instrument, and, as claimed by the plaintiff, remained in the continuous occupation thereof until the time of his death. About 15 acres of ground in the northeast corner of the land in controversy had been broken and farmed prior to the time of the purchase, and this he continued—either by himself or his tenant—to farm from year to year, as long as he lived. The remaining portion of the quarter section he used as a pasture for his flocks. He also owned and, from time to time, leased other land in the immediate vicinity, which he used in the same manner and for the same purpose. Some time prior to his death, he executed a last will and testament, in which he devised the land in controversy to the plaintiff. This will was probated, and on the 12th day of July, 1909, a decree of distribution entered by the county court of Potter county, decreeing plaintiff to be the owner of the premises, was filed for record, in the office of the register of deeds of that county.

This action was commenced by the issuance of the summons and the filing of the complaint in the office of the clerk of courts for Potter county, on the 7th day of May, 1910; and on that day plaintiff filed for record, in the office of the register of deeds of said Potter county, a proper notice of *lis pendens*. On the

7th day of April, 1902, the said Chamblin by a warranty deed undertook to convey the said premises to one John Campbell; and thereafter, by sundry conveyances, the title, if any, so conveyed to Campbell passed to the defendant, Robert A. Gross, on the 11th day of September, 1905. On the 11th day of December, 1905, Gross conveyed such title as he had to one Sell, who on October 17, 1907, reconveyed to said Gross. On the 8th of November, 1907, said Gross conveyed his title to one Zessin, who on the 7th of March, 1910, reconveyed to Gross; and he (Gross) by deed dated April 27, 1910, conveyed his title to Oscar D. Bost, who filed his deed for record on the 17th day of May, 1910. On the 13th day of May, 1910, Bost executed and delivered to Gross a mortgage as security for the payment of $5,000, which mortgage was filed for record on the 17th day of May, 1910—ten days after the filing of plaintiff's notice of *lis pendens*. On the 5th day of July, 1910, the court, upon a proper petition, entered an order permitting Bost to file a complaint in intervention, and making him a party to the action as intervener.

Plaintiff, in her complaint, alleged that she was the owner in fee of the land in controversy, and asked for a decree, decreeing her to be the owner thereof in fee, that title thereto be quieted in her, and that defendant be decreed to have neither right, title, nor interest in or to said premises. Defendant Gross answered plaintiff's complaint, denying plaintiff's interest in the land, and asked that she be decreed to have no interest therein, and that said mortgage to him be decreed to be superior to plaintiff's claim. Intervener, Bost, in his complaint in intervention, alleged ownership in fee in himself of the disputed premises; that plaintiff's claim of title thereto was subsequent and inferior to his, but that the said claim constituted a cloud on his title, and asked that title to the land be quieted in him, and that plaintiff be enjoined from asserting any further claim thereto.

As to whether or not Chamblin was living at the time of the trial is not disclosed by the record; neither is there any evidence anywhere in the record showing whether or not the notes provided for in the contract were ever executed or delivered by the said Edgerton. Neither is there any evidence in the record showing whether or not any of the said notes, or any sum of money evidenced thereby, was ever paid to Chamblin by Edgerton, and

the finding of fact by the court that no part of the purchase price, nor any taxes, had ever been paid by Edgerton is without any support whatever in the evidence.

At the trial, the court, among others, made the following findings of fact:

"VII. That no knowledge upon the part of said C. E. Chamblin and his grantees, or any of them, of the claim of said Stoughton P. Edgerton, if any, to said premises was shown; that it was not shown that Stoughton P. Edgerton during his lifetime, or the plaintiff thereafter, or any one in their behalf, ever paid any taxes assessed against said premises;

"VIII. That neither the said Stoughton P. Edgerton, during his lifetime, nor any one in his behalf, nor the said plaintiff since the decease of said Edgerton, paid any sums of money whatsoever under or in pursuance of the provisions of said bond for deed, nor otherwise in any way complied with the conditions thereof, and there was no showing that such payments, or any of them, were ever made, and that, by the failure of the said Edgerton to make the first payment above referred to at the time provided in said contract, said contract became void and of no effect;·

"IX. That said Stoughton P. Edgerton during some of the years following the execution of said bond for deed grazed his sheep upon said premises, and during some of the years prior to his death cultivated about 15 acres thereof; but there was no showing that the said C. E. Chamblin and his grantees, or any of them, ever had knowledge of the pasturing of said sheep or the cultivation of said 15 acres, and that the use of said premises by said Stoughton P. Edgerton during his lifetime was in no manner known to or acquiesced in by the said Chamblin, or any of his grantees;

"X. That upon the 11th day of September, 1905, the date of the said deed executed by Ezra W. Patterson to said Robert A. Gross, and during the whole of the year 1905, said Stoughton P. Edgerton did not occupy the said premises and did not cut any hay thereon nor cultivate any portion of said premises, or otherwise, and that said Robert A. Gross, upon the said 11th day of September, 1905, and until the year 1907, had no actual knowledge of the existence of said bond for deed, and that he purchased the said premises at said time for value;

"XI. That neither the said Stoughton P. Edgerton during his lifetime nor the said plaintiff at any time made any offer or tender to comply with or perform any of the conditions of said bond for deed."

[1] Whether the plaintiff has any rights in the premises depends largely upon whether or not the defendants were charged with notice of Edgerton's contract at the time they purchased their interests. It will be remembered that Edgerton's bond for deed was not acknowledged by Chamblin, and therefore was not entitled to record; and the record thereof was not constructive notice to subsequent purchasers. It was a valid contract, however, as between the parties themselves, and binding upon subsequent purchasers who had knowledge of it at the time they acquired their interests: Civ. Code, § 990. Any one who saw it, or who saw the record thereof, would be charged with knowledge of Edgerton's rights. While it is not at all likely that the various parties who claimed to have purchased this property for value would have done so without examining the title as it appeared of record, and would necessarily have seen this contract, there is no evidence that any of them did see it or have actual knowledge of its contents; and we cannot presume that they did.

[2, 3] It is claimed by plaintiff, however, that Edgerton went into possession of the property as his own under the contract, and that he remained in continuous possession thereof and used the same as his own during the remainder of his lifetime, and that such use and occupation was sufficient to charge the defendants with knowledge of all the rights he actually had. On the other hand, it is claimed by the defendants—and the court so found— that Edgerton was not occupying or in possession of the land when Gross acquired his title, on the 11th day of September, 1905; that Gross was a purchaser for value, without notice, and therefore his title and that of his grantees was freed from the rights of Edgerton. If this finding by the trial court is correct or supported by the evidence, it disposes of the case. It is contended by the appellant, however, that this finding is not only without support in the evidence, but that it is contrary to all of the evidence. Of course, this being a finding of fact by the trial court, it will not be disturbed unless it is against the preponderance of the evidence, or, if the evidence on this point is conflicting, then the finding of

the trial court is conclusive upon this court (Durand v. Preston, 26 S. D. 222, 128 N. W. 129); but, after a careful examination of the evidence, we are of the opinion that this finding is without any support whatever in the evidence.

[4] It is not contended by respondents that the use and occupation of the land by Edgerton was not sufficient to charge Chamblin's grantees, who acquired their interests prior to the 11th day of September, 1905, with knowledge of his (Edgerton's) rights. It was on this date that the defendant Gross first became connected with the title. If Edgerton's possession at that time was such as to charge Gross with knowledge of his rights on that date, it is immaterial whether his grantees, with the exception of Bost, were *bona fide* purchasers or not. If Gross conveyed the title to a *bona fide* purchaser without notice, then such purchaser took the property freed from the rights of Edgerton. But, when such purchaser reconveyed to Gross, Gross again took the title subject to the rights of Edgerton. 2 Pom. Eq. § 754, where the rule is stated as follows: "If the title to land, having passed through successive grantees, and subject, in the hands of each, to prior outstanding equities, comes to a purchaser for value and without notice, it is at once freed from these equities; he obtains a valid title, and, with a single exception, the full power of disposition. This exception is that such a title cannot be conveyed, free from the prior equities, back to a former owner who was charged with notice." Therefore, if Gross was charged with notice of Edgerton's rights when he first became connected with the title to the premises, the title, when reconveyed to him, would still be subject to the rights of Edgerton, whether his grantees had been *bona fide* purchasers or not; and Bost does not claim to be in any other, or better, position than that occupied by Gross.

It is conceded that Edgerton went into possession of the premises at about the time of the execution of the contract. The land, with the exception of a 15-acre tract in the northeast corner, which had been broken and cultivated before that time, was unfenced and unbroken. In that condition it could be used only for pasturage. Evidence furnished by the testimony of a neighbor, who had lived near by during all of the time since the execution of the contract, was to the effect that Edgerton ploughed and

planted crops on the cultivated portion of this land every year. That some years, when the crop did not promise well, he had turned his sheep upon it and used it for pasture—the same as the other portions of the land. It was not claimed that he lived upon it, or that he was upon it himself every day, or that he kept his flocks constantly upon this particular quarter section of land; but it was clearly shown that he used it every year in the manner and for the purposes to which it was best suited, and used it exactly as he did other land that he owned or occupied under lease in the same vicinity. He exercised absolute dominion over it, and his occupancy was open and visible to all the world. For the season of 1908 he leased the cultivated portion of the land to a neighbor, but retained and used the remaining portion himself. When it came to the most solemn transaction of a man's life, viz., the execution of his last will and testament, he treated this piece of property as though he were the owner thereof, in fee simple, and disposed of it by devise, the same as he did his other property.

To show that Edgerton's occupancy of the land had not been continuous, the respondents undertook to show, by the testimony of the defendant Gross, that he was upon the premises on the 11th day of September, 1905—the day upon which he first acquired his interest in the ground—and that upon that occasion he did not see Edgerton, or any one else, thereon; that there had been no hay cut upon the place that year; neither were there any sheep, or other stock, pasturing there at that time; and that the ploughed portion of the land had not been cultivated for that year. His testimony, however, covered only the particular time that he was upon the ground. He does not appear to have been there more than an hour, and he could have done all that he says he did while upon the ground in half that length of time. Although Edgerton's residence was within half a mile of the premises, and he claimed to have been acquainted with Edgerton since he was a child, he did not go there, or elsewhere, to make inquiries as to whether the land was occupied or not; nor did he undertake to show that the land was vacant, except during the time he was actually upon it. He claimed to have been upon the premises on another occasion—as early as the month of June of that year. He did not say, however, that the premises were unoccupied at that time. For aught that appears from his testi-

money, the land may have been used for pasturage every day of the year 1905. Stock that was using that land for pasturage at that time may have been temporarily absent, or it may have been taken to water and returned within a few hours. A neighbor, who lived near to and passed by the premises frequently, and who had no interest whatever in the result of the action, swore positively that Edgerton did use the land in question during the season of 1905; that he was sure that Edgerton put in a crop on the cultivated portion of the land that year, although he thought that was one of the years when the crop did not give promise of success and was used by Edgerton for pasturage.

[5] It was not disputed that Edgerton was still in possession of and using the land in the ordinary manner during the seasons of 1906 and 1907, and that for the season of 1908 he leased the cultivated portion of the land to another party. These were all acts of ownership, and, while they are not, in themselves, evidence of title, they were sufficient to give notice to the world of whatever rights in the premises he actually possessed, and to put prospective purchasers upon inquiry as to the extent of what his rights actually were. It was not necessary that the said Chamblin, or his grantees, should have had actual knowledge of Edgerton's possession and occupation of the ground. His possession was sufficient to charge them with notice thereof; and, if they purchased the property without ascertaining the extent of Edgerton's rights, they did so at their own risk: Izard et al. v. Kimmel et al., 26 Neb. 51, 41 N. W. 1068; Houzik v. Deleglise, 65 Wis. 494, 27 N. W. 171, 56 Am. Rep. 634; Meade v. Gilfoyle, 64 Wis. 18, 24 N. W. 413; Watters et al. v. Connelly et al., 59 Iowa, 217, 13 N. W. 82; Allen v. Cadwell, 55 Mich. 8, 20 N. W. 692; Corey v. Smalley et al., 106 Mich. 257, 64 N. W. 13, 58 Am. St. Rep. 474; Miner v. Wilson, 107 Mich. 57, 64 N. W. 874; Moyer v. Hinman, 13 N. Y. 180; School Dist. No. 3 et al. v. Macloon et al., 4 Wis. 79; Biemann v. White, 23 S. C. 490; Nolan v. Grant, 51 Iowa, 519, 1 N. W. 709; Betts v. Letcher, 1 S. D. 182, 46 N. W. 193.

[6] Many of the above cases hold that far less acts of ownership than were shown by Edgerton were sufficient to constitute adverse possession. Where the acts of a vendee are such that reasonable inquiry would reveal his possession, a subsequent purchaser is charged with notice of the vendee's rights, though his

title is not of record. Banner et al. v. Ward et al. (C. C.) 21 Fed. 820.

Appellant assigned a number of errors based upon the admission and exclusion of evidence on the trial. These have been examined; but, in our view of the case, they are not material, and therefore it will not be necessary to take them up and consider them in detail.

It is contended by the appellant that the evidence is insufficient to support the findings of fact and conclusions of law made by the court. It will be noticed that many of these so-called findings of fact are not findings of fact at all, but are merely negative findings to the effect that there is no evidence to prove certain facts, and are therefore of no materiality to a decision of the case. The findings in regard to the possession and occupation of the land are disposed of by what has already been said.

[7, 8] This brings us to the conclusions of law. The court, among other conclusions, made the following: "That Stoughton P. Edgerton, during his lifetime, abandoned said contract for deed, and the assertion of claim of title to said premises under the same." There is no warrant in the record for this conclusion. In the first place, abandonment is a question of fact, and not of law: 1 Cyc. 8, and cases cited. There is no evidence whatever to show that Edgerton ever intended to abandon his interest in the land in controversy, nor to relinquish his possession thereof. The mere fact of non user for a period of time, if such had been shown, would not be sufficient to warrant a finding that abandonment had taken place. "Abandonment includes both the intention to abandon and the external act by which the intention is carried into effect:" 1 Cyc. 4. Neither was it shown that Edgerton ever did any act or made any statement or admission that would estop him from claiming title to the ground under his bond for deed.

[9] The court also held, as a matter of law, that: "Said bond for deed was absolutely extinguished by the failure of said Edgerton to make the payments therein provided for." This conclusion is evidently based upon the theory of the court that time was of the essence of the contract, and the failure on behalf of Edgerton to perform any of the conditions thereof on the day provided therefor would work a forfeiture of all his rights under the contract. This conclusion is clearly without support in the

evidence. In the first place, there is no evidence to show that all of the notes were not paid when due; and, in the second place, a forfeiture would not have resulted in case the payments were not made when due. It is true that the contract contained the declaration that: "It is expressly understood and agreed by and between the parties hereto that time is of the essence of the contract," and that a failure on the part of Edgerton to comply with any of the covenants contained therein at the time agreed upon by the parties would work a forfeiture of all of his rights under the contract. This stipulation, however, is a part of the printed form, and was superseded by the provisions, interlined by the parties themselves, that all overdue sums of money should draw interest at the rate of 6 per cent. *after maturity*, "and if the interest be not paid annually, to become as principal and bear the same rate of interest." It must be borne in mind that the contract provided for the execution, by Edgerton, of ten promissory notes, payable at future dates, and interest was to accrue on the notes only after maturity. If default had been made and if the interest was not paid annually, it was to be added to the principal and draw interest at the same rate as the original—plainly showing that it was the intent of the parties that, in case Edgerton made default in the payment of either of the notes when the same fell due, the penalty for such default should be the payment of interest on the overdue sums, and not the forfeiture of his rights under the contract.

[10] It has recently been held by this court that whether or not time is to be considered as of the essence of a contract depends upon the intention of the parties thereto and the object to be attained by the contract, rather than upon the express declaration of the parties contained therein: Western Townsite Co. v. Lamro Townsite Co. et al., 139 N. W. 777. This contract will bear no other construction.

[11] The court held, as a matter of law, that the plaintiff had no interest whatever in the disputed premises; that the defendant Bost was the owner in fee thereof, subject to a mortgage for $5,000 in favor of the defendant Robert A. Gross. Whether or not this conclusion is correct depends upon the interest acquired by Edgerton in the premises by the execution and delivery of the contract in question, the delivery to Edgerton of the possession

of the premises, and the relation created thereby between Chamblin and Edgerton. It must be borne in mind that the contract contains no optional features; neither is it a mere contract to sell real property at some future date. By the recitals contained in the contract, it appears that the sale of the land had already taken place. Upon the execution and delivery of the contract, Edgerton became the equitable owner of the property, vested with all the rights and privileges of absolute ownership. It is true that Chamblin retained the legal title, but he retained only the naked legal title, and this only as security for the payment of the notes given for the purchase price of the land, but without any of the rights of ownership. The relation that existed between Chamblin and Edgerton became that of creditor and debtor: "That of equitable mortgagor and mortgagee, the vendor holding the legal title as security for the unpaid money, which security it has been held, is essentially a mortgage interest. The vendee has an equity of redemption, and the vendor a correlative right of foreclosure upon default in the payments; but in this, as in all similar cases, the mortgage is the incident, the debt the principal and the vendor has no further interest except to the extent of the security the mortgage affords for his debt. Subject to these rights of the vendor, the vendee has absolute control of the property, and may dispose of it or incumber it in exactly the same manner as land to which he has the legal title:" 1 Warvelle on Vendors (2d Ed.) § 174; Thompson v. Smith, 63 N. Y. 301; Peay v. Seigler et al., 48 S. C. 496, 26 S. E. 885, 59 Am. St. Rep. 731. And this court held in a recent case that: "The vendee in possession became vested with the entire equitable estate in the real property which is the subject of the contract, and that the vendor only held and retained the legal title to the same as security for the payment of the unpaid portion of the purchase price:" State ex rel. Dillman v. Weide, 29 S. D. 109, 135 N. W. 696.

"While the legal relations between the two contracting parties are wholly personal—things in action—equity views all these relations from a very different standpoint. In some respects and for some purposes, the contract is executory in equity as well as at law; but so far as the interest or estate in the land of the two parties is concerned, it is regarded as executed, and as operating

to transfer the estate from the vendor and to vest it in the vendee. By the terms of the contract the land ought to be conveyed to the vendee, and the purchase price ought to be transferred to the vendor; equity, therefore, regards these as done: the vendee as having acquired the property in the land, and the vendor as having acquired the property in the price. The vendee is looked upon and treated as *the* owner of the land; an equitable estate has vested in him commensurate with that provided for by the contract, whether in fee, for life, or for years; although the vendor remains owner of the legal estate, he holds it as a trustee for the vendee, to whom all the beneficial interest has passed, having a lien on the land, even if in possession of the vendee, as security for any unpaid portion of the purchase money. * * * The equitable interest of the vendor is correlative with that of the vendee; his beneficial interest in the land is gone, and only the naked legal title remains, which he holds in trust for the vendee, accompanied, however, by a lien upon the land as security when any of the purchase price remains unpaid. This lien, like every other equitable lien, is not an interest in the land, is neither a *jus ad rem,* nor a *jus in re,* but merely an incumbrance." I Pom. Eq. (3d Ed.) § 368. And, quoting from the the same author, 6 Pom. Eq. § 862: "The analogy of the relation arising from the contract of the sale and the mortgage relation serves equity again in tracing the right of the vendor to be freed from the vendee's continuing right of specific performance, where the vendee himself will not pay the purchase money. The vendee, who corresponds to the mortgagor, failing to pay the purchase money, still has his equity of redemption; the vendor has neither his money nor the land, for he has hanging over him the vendee's right in equity to have the land, and has no power over the land other than that of mortgagee—i. e., to hold it as security. But, to do justice to the vendor, where the vendee fails to pay the purchase money, equity allows a foreclosure of the vendee's right to have specific performance, analogous to the foreclosure of the mortgagor's equity of redemption. By the decree, the vendee is ordered, within a reasonable fixed time, to pay the purchase money or to be forever foreclosed of his equity in the contract." This rule, applied to the case at bar, gave the vendor, Chamblin, the right to foreclose his lien upon the property con-

tracted to be sold whenever the vendee, Edgerton, defaulted in payment of any of the notes. The right to foreclose, however, was the extent of his right, and Edgerton's equitable estate would remain intact in him until it was terminated by appropriate action by Chamblin; and this right of foreclosure existing in favor of Chamblin necessarily implies the correlative right of payment and redemption existing in favor of Edgerton, until such times as he had been divested of his equitable estate by such foreclosure proceedings. This being the case, Chamblin could not have ousted Edgerton of his possession, nor have maintained an action to quiet title in himself as against Edgerton; and, as Chamblin's grantees took no better title than he had, they are not in position to maintain their causes of action set up in the answer of the defendant and in the intervener's complaint in intervention.

[12] On the other hand, Edgerton's grantee (the plaintiff in this action) took no greater right in the premises than he had; and it nowhere appearing that he ever paid the purchase price for the land or became possessed of the legal or equitable title thereto, plaintiff failed to establish her ownership in fee, and therefore failed to establish her cause of action.

Neither party to the action having established his claim, it necessarily follows that the judgment and order appealed from. must be reversed, and the cause remanded for such further action as the parties may deem appropriate.