BOARD OF PARK COM'RS *v.* CITY OF NASHVILLE.

(*Nashville.* December Term,. 1915.)

1. **MUNICIPAL CORPORATIONS.** Fiscal management. Separate funds.

Under Acts 1913, chapter 22, section 27, creating a sinking fund for the city of Nashville into which shall be paid ten per cent. of all taxes, revenues, and collections from all sources whatsoever, except from the tax for school purposes, and from any money from the sale of bonds, and section 39, creating the board of park commissioners and providing for a special tax of not less than ten cents on the $100, separate and distinct from the levy for ordinary municipal purposes, which shall not be diverted from the park commissioners, but shall remain a separate and distinct park fund, the city has no authority to divert from the fund created by the special tax for park purposes ten per cent. for the sinking fund. (*Post, pp.* 627-629.)

Acts cited and construed: Acts 1899, ch. 204; Acts 1901, ch. 117; Acts 1913, ch. 22, sec. 27.

2. **STATUTES.** Construction. General and special provisions.

Where there is a general provision applicable to a multitude of subjects, and a provision which is particular· and applicable to one of those subjects inconsistent with the general provision, the special provision will stand as an exception, and the general provision will be construed to operate on all subjects introduced therein, except the one covered by the special provision; the court not being confined to the literal meaning of words in arriving at the intention of the legislature. (*Post, pp.* 629-631.)

Cases cited and approved: Hightower's Lessee v. Wells, 14 Tenn., 249; Stockett v. Bird's Adm'r, 18 Md., 484; Albertson v. State, 9 Neb., 429; Ryan v. State, 5 Neb., Omaha Real Estate & Trust Co. v. Reiter, 47 Neb., 592; Quick v. White Water

Board of Park Commissioners v. Nashville.

Township, 7 Ind., 570; People v. McClave, 99 N. Y., 83; Brown v. Hamlett, 76 Tenn., 735.

Cases cited and distinguished: Hayes v. Arrington, 108 Tenn., 494; Standard Oil Co. v. State, 117 Tenn., 638.

3. **STATUTES.** Construction. Expressio unius est exclusio alterius.

The maxim, "*Expressio unius est exclusio alterius,*" is not flexible, and should always be applied to accomplish the legislative intention, and not to defeat it. (*Post, pp.* 631, 632.)

Case cited and approved: E. M. Matthews Co. v. Atlantic Coast Line R. R. Co., 86 S. E., 1069.

Case cited and distinguished: Colquhoun v. Brooks, L. R., 19 Q. B., Div., 400.

4. **STATUTES.** Construction. General rules. Construction as a whole.

In construing a statute, the meaning is to be determined, not from special words in a single sentence or section, but from the act taken as a whole, comparing one section with another, and viewing the legislation in the light of its general purpose. (*Post, pp.* 632, 633.)

Cases cited and approved: Darnell v. State, 123 Tenn., 666; Palmer v. Express Co., 129 Tenn., 157.

5. **MUNICIPAL CORPORATIONS.** Fiscal management. Separate funds.

Acts 1913, chapter 22, section 27, authorizing deduction of ten per cent. of all revenues of the city of Nashville for its sinking fund, construed in connection with section 39, providing for a special tax for park purposes, does not authorize the diversion of a part of a fund derived from a railway under a compromise decree in litigation between the railway and the city, whereby the railway is required to pay a percentage of its gross earnings for the exclusive benefit of the park fund of the city. (*Post, pp.* 633-635.)

Acts cited and construed:   Acts 1913, ch. 22, sec. 27.

Cases cited and approved:   Wilkins v. Railroad, 110 Tenn., 442;
State ex rel. v. Cummings, 130 Tenn., 566;   City of Jackson-
ville v. Jacksonville Ry. Co., 67 Ill., 540;   Village of Riverside
v. MacLain, 210 Ill., 308;   South Park Com. v. Montgomery
Ward & Co., 248 Ill., 304;   Ward x. Field Museum, 241 Ill., 508;
City of Hopkinsville v. Jarrett, 156 Ky., 777.

6. **MUNICIPAL CORPORATIONS.   Fiscal management.   Sepa-
rate funds.**

A compromise decree in litigation between a railway and a city
whereby the railway is required to pay a percentage of its
gross earnings exclusively for park purposes, in consideration
of exemption from a privilege tax on the property of the rail-
way company, created a trust fund for park purposes which
the legislature has no power to divert to another city fund.
(*Post, pp.* 633-635.)

7. **MUNICIPAL CORPORATIONS.   Board of park commission-
ers.   Power to sue.**

Under Acts 1913, chapter 22, section 39, creating the board of
park commissioners of the city of Nashville with perpetual suc-
cession and the power to buy real estate for park purposes, to
execute bonds and mortgages for land purchased, to condemn
land, to receive gifts, donations, and devises, to make contracts,
to employ superintendents and subordinates, to protect park
property, and to draw and expend funds appropriated for the
use of the parks, the board of park commissioners is a cor-
poration or *quasi* corporation having the power to sue.   (*Post,*
*pp.* 635-639.)

Cases cited and approved:   People v. Watertown, 1 Hill (N. Y.),
620;   O'Leary v. Fire Ins. Com., 79 Mich., 281;   Com. v. W. C.
R. Co., 3 Grant Cas. (Pa.), 200;   Jonesboro v. McKee, 10 Tenn.,
167;   Doty v. Tel. & Tel. Co., 123 Tenn., 329;   Snow, Church &
Co. v. Hall, 19 Misc. Rep., 655;   Thomas v. Dakin, 22 Wend (N.
Y.), 9;   North Hempstead v. Hempstead, 1 Hopk. Chy. (N. Y.),
288;   Jansen v. Ostrander, 1 Cow. (N. Y.), 670;   Overseers of

Pittstown v. Plattsburgh, 18 Johns. (N. Y.), 418; Jackson v. Hartwell, 8 Johns. (N. Y.), 425; Murray v. Jayne, 8 Barb., 612; Fourth School Dist. v. Wood, 13 Mass., 193; Cornell v. Guilford, 1 Denio (N. Y.), 515; Van Keuren v. Johnston, 3 Denio (N. Y.), 183; Suprs. of Galway v. Stinson, 4 Hill (N. Y.), 136; Cornell v. Woodard, 5 How. (Miss.), 665; Todd v. Birdsall, 1 Cow. (N. Y.), 260; Armine v. Spencer, 4 Wend (N. Y.), 406; Dean v. Davis, 51 Cal., 406; Clarissy v. Fire Dept., 7 Abb. Prac. (N. S. N. Y.), 352; Trustees of Schools v. Tatman, 13 Ill., 27; Duntz v. Duntz, 44 Barb. (N. Y.), 459; State v. Hulin, 2 Or., 306; Horton v. Garrison, 23 Barb. (N. Y.), 176; School Dist. No. 3 v. Macloon, 4 Wis., 79; Grant v. Fancher, 5 Cow. (N. Y.), 309.

Case cited and distinguished: Denton v. Jackson, 2 Johns. Ch. (N. Y.), 320.

8. **CORPORATIONS. Incidental powers. Power to sue.**
The power to sue is one of the incidental rights of a corporation, whether mentioned in the charter or not. (*Post, pp.* 635-639.)

---

FROM DAVIDSON

---

Appeal from the Chancery Court of Davidson County.—JAS. R. WEST, Special Chancellor.

A. G. EWING, JR., City Attorney, and F. M. GARARD, Assistant City Attorney, for appellant.

VERTREES & VERTREES, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This is an agreed case filed in the chancery court of Davidson county to determine the respective rights of the board of park commissioners and the city of Nashville touching funds appropriated by law and by contract to the former.

The board of park commissioners was created by chapter 22 of the Private Acts of 1913, section 39. The board existed under previous charters but these need not be referred to.

Section 39 reads:

"1. That there shall be a board of park commissioners of the city of Nashville, composed of five members, who shall have been *bona fide* residents and citizens of said city for at least five years prior to their becoming members of said board; and the term of office of each of the five members of said board shall be five years from the first day of May of the year he becomes a member of said board, or until his successor shall have been selected and qualified; and upon a vacancy by resignation, death, expiration of the term of office, or otherwise, of any member of said board, his successor shall be selected by the remaining members of said board of park commissioners, subject to the approval of a majority of the board of commissioners of said city. . . .

"2. The members of said board shall devote such time and attention to the duties of their office as the ef-

ficient performance thereof may demand and require, and their services shall be without compensation. . . ."

The section then provides that each member shall take an oath of office and execute a bond in the sum of $10,000 for the faithful performance of his duties; this bond to be approved by and deposited with the board of commissioners of the city of Nashville. The section proceeds:

"The members of said board of park commissioners shall, immediately upon their appointment and qualification, as above provided, organize by selecting· one of their number as chairman, and by the election of a secretary, who need not be a member of the board. The term of office of the chairman and secretary shall each be one year, but they may be re-elected to any number of successive terms. The salary· of the secretary shall be fixed by said board of park commissioners, and his duties shall be prescribed by said board.

"3. That whenever, in the opinion of said board of park commissioners, property within or near said city shall be needed for any park purposes, said board may acquire the same by purchase, or may proceed to condemn the same; and the proceedings for such condemnation shall be under the provisions of, and as prescribed by, sections 1325 to 1348, inclusive, of the Code of Tennessee, the same being sections 1884 to 1867, inclusive, of Shannon's Compilation of the Laws of Tennessee. The said board shall be authorized to establish one or more parks in such locality or localities as they

deem in their discretion best for the interest of said city. The title to all property acquired for park purposes by gift, devise, or condemnation shall rest in the city of Nashville; but the legal title to all property acquired by said board of park commissioners by purchase shall be taken in the name of the chairman of said board of park commissioners as trustee until fully paid for; and the city of Nashville shall in no wise be responsible for any portion of the purchase money agreed to be paid therefor, except it agree by ordinance, duly enacted by the board of commissioners of said city, to purchase said lands, whereupon said trustee shall immediately convey the same to the city of Nashville. Said board of park commissioners shall have full power and authority to purchase any land deemed by them suitable for park purposes, and to execute notes or bonds therefor, with interest payable annually or semiannually, maturing at such time as may be agreed upon, signed by the chairman and secretary of said board, and to secure the purchase money due for the same by mortgage or vendor's lien upon the property purchased, and may sell any portion thereof not needed for park purposes by direction of a majority of said board of park commissioners, and apply the proceeds of any property so sold to the payment of the mortgage or vendor's lien given to secure the purchase money for the whole until said mortgage or lien shall be fully satisfied, whereupon any of said property remaining unsold shall immediately be conveyed by said trustees to the said city of Nashville.

"4. That said board of park commissioners, constituted as aforesaid, shall have the care, management, and custody of all parks and grounds used for park purposes, and all such property as may hereafter be acquired for park purposes by said board of park commissioners. The said board of park commissioners shall have power to receive gifts, donations, or devises of land, or may accept other property for park purposes; to lay out and improve walks, drives, roads, tree planting, and other improvements to park or parks, and to enter into all contracts for the same; protect all property and improvements belonging to or pertaining to said parks, or under their management or control, from injury or decay; to adopt rules and ordinances regulating the reasonable and proper use of, preventing injury to and misuse of all parks, walks, walkways, and park property generally; and to prevent disorder and improper conduct within the precincts of the park or enclosure, and providing punishment therefor, or for the infraction of the rules adopted by said board of park commissioners; and the police power of the city in or adjacent to which the said park or parks may be situated shall extend over such park property or properties of every kind as the same is or shall be acquired; and all violations of such rules and ordinances adopted by said board of park commissioners, and all other misdemeanors and offenses committed within any park property or precinct, may be punished by the city court of said city upon complaint and proceedings as provided by law

in cases of misdemeanor and violations of city ordinances. The said board of commissioners, and their agents and employees, will have the power to make arrests for misdemeanors committed within any park precinct or any violation of any of the park rules or ordinances.

"5. That the board of park commissioners shall have exclusive power to employ and pay such superintendents, employees, and other persons as it may deem necessary for maintaining, improving, and controlling all park property; and it shall have authority to make any other expenditures for park purposes within its funds and its powers as defined herein. Said board of park commissioners shall, each year prior to the making of the annual levy of taxes by the board of commissioners of said city, prepare and submit to the board of commissioners an estimate of the amount of money which shall be required for the purchase, maintenance, and improvement of park property for the succeeding year, beginning January first, which estimate shall set forth the items of expense as accurately as possible; and it shall be the duty of the board of commissioners of said city, in its annual levy of taxes, to make such special levy for park purposes, separate and distinct from its levy for ordinary municipal purposes, of a tax of not less than ten cents on the one hundred dollars of the value for assessment within said city as shall be necessary to meet the expenditures contemplated in said estimate of the board of park commissioners; and the amount so levied shall

be collected and carried to the credit of the board of park commissioners, and shall not be diverted therefrom; and the same shall remain a separate and distinct park fund in the hands of the commissioner of finance, lights, and market house of said city. All expenditures on account of this fund shall be made upon vouchers approved by the park commissioners through its chairman and secretary, which vouchers shall, when accompanied by detailed statements of such expenditures, be payable on presentation at the revenue office of said city. All funds arising from any source which are to be devoted to or used for the purchase, maintenance, and betterment of the public parks owned or controlled by said city, shall be paid from time to time to the commissioner of finance, lights, and market house, and a separate account thereof kept. The park commission, through its proper officials, shall be authorized to draw from time to time upon said funds; and it shall be the duty of the commissioner of finance, lights, and market house to pay such checks whenever drawn, so long as there is a balance to the credit of the account of public parks; but the money so drawn shall be used to purchase, repair, improve, and maintain the public parks in and near the city of Nashville under the management of said board of park commissioners.

"6. That the board of park commissioners shall keep accurate records and books of account, and shall make a report to the board of commissioners of said city during the month of December of each year, showing the

amounts received, from what source, how expended, with such explanations and recommendations as may be deemed to the best interest of the public parks.

"Books of account of said board and of all officers thereof shall at all times be open to the inspection and examination of the board of commissioners of said city or any accountant designated by the board of commissioners of said city to make the examination.

"7. That the board of commissioners of said city may, from time to time, upon application therefor, made by the board of park commissioners, provide by ordinance for special park police, the same to be under the control of the board of park commissioners.

"8. That the term 'park property' as used in this act shall include all parks and areas of land within the management of said board of park commissioners, and all buildings, structures, and improvements thereon of every kind and character whatever."

The controversy arises over the provisions of a prior section, which, so far as necessary to be produced, reads as follows:

"Sec. 27. That, for the purpose of providing means for the liquidation and retirement of the bonded indebtedness of said city, a sinking fund is hereby created, into which shall be paid, on the first of each month after this act becomes effective, ten per cent. of all taxes, revenues, and collections from all sources whatsoever, except from the tax for school purposes and from any money derived from the sale of any bonds received by and coming into the city treasury. The

commissioner of finance, lights, and market house shall, at the end of each month, out of said taxes, revenues, and collections, except out of the taxes for school purposes and from any money derived from sale of any bonds received during said month, deduct ten per cent. from the aggregate thereof, and deposit same in one or more of the city depositories to the credit of 'sinking fund'; and he shall open and keep in his books in his office an account designated 'sinking fund account,' which shall show accurately and specifically all payments made into and all disbursements made out of said sinking fund; and no disbursement out of said sinking fund shall be made for any purpose, except as hereinafter directed. The moneys paid into the sinking fund as aforesaid shall be used only and exclusively for the purchase, retirement, or payment of any outstanding bonds of the said city.''

This provision as it appears in the charter act of 1899 (Laws 1899, chapter 204), is as follows:

''For the purpose of providing means for the liquidation and retirement of the bonded indebtedness of such cities having outstanding bonded indebtedness, a sinking fund is hereby created into which shall be paid, commencing on the first day of January 1900, ten per cent. of all taxes, revenues, and collections from all sources except from the tax for school purposes, received by and coming into, the city treasury.''

Section 39 originated with the charter act of 1901 (Acts 1901, chapter 117), but the provisions of that

act and of the charter act of 1905 in this respect are the same as those of the charter act of 1913.

Under and pursuant to the provisions of the charter relating to parks, the city of Nashville has annually since 1908 levied a special tax for park purposes. In 1915 this tax amounted for that year to $85,016.65.

There was a litigation between the city of Nashville and the Nashville Street Railway which was settled by a compromise decree of this court on the 3d day of October, 1902. The agreed case states that this litigation involved "the question of the forfeiture or existence of the rights of the street railway company, in, along, and over the streets and highways of the city of Nashville."

The compromise decree provided that the street railway company should purchase and convey Centennial Park, which was worth $125,000, to the city, and should—

"pay over to the mayor and city council of Nashville two per cent. of its annual gross car receipts until such gross annual car receipts amount to $1,000,000, after which it shall pay three per cent. of its gross annual car receipts. Said sum to be paid quarterly, and it is to be used exclusively for the maintenance, betterment, and repairs of public parks owned by the city under the direction of the park commissioners, and it is to be in lieu of all special or privilege taxes or charges levied or imposed by the mayor and city council of Nashville, or for its benefit, upon said Nashville Railway,

its successors or assigns, but it is not to be in lieu of *ad valorem* taxes."

The amount of car receipts paid in under this agreed decree for the year 1915 was $40,404.55.

The railway company has paid to the city for park purposes a certain portion of its annual car receipts since 1902; and the city has levied a special tax exclusively for park purposes annually since 1908.

The car receipts paid in for 1915 were $40,404.55, as already stated, and the special tax for 1915 $85,016.65, making the total park fund for 1915 $125,421.20.

During the years 1909-13 the city expended out of its general revenues $100,270.54, in the aggregate as follows: For lands purchased for parks, $84,270.54; for music at the parks, $10,000; for Art Association and exhibits, $6,000.

No bonds of the city have been issued for park purposes. The city supplies the parks with electric current from its street lighting plant to light them at a cost of $10,000 a year. It also supplies the parks with water from the city waterworks at a cost of $5,500 a year It makes no charge for electricity, but does charge the park board $1,000 per annum for water furnished. The city has constructed streets and sidewalks abutting on and adjacent to some of the parks out of money derived from the sale of bonds, but it has not built any streets and driveways and walks in the parks.

The city has a bonded indebtedness of $8,760,000, but no part of it was created for park purposes, and it owes nothing on account of the parks.

134 Tenn. 40

No part of the park fund, derived either from the special park tax levy or the car receipts paid in by the street railway company, which, as we have said, amounted in 1915 to $125,421.20, was diverted to the sinking fund prior to 1914. But out of the car receipts for 1914, which amounted to $43,855.86, the city withheld and diverted to the sinking fund ten per cent. thereof, or $4,385.58. It did not divert any part of the special tax fund for 1914. But it did withhold and divert ten per cent of the funds from both sources for and in 1915, and purposes to continue this practice.

The amount so diverted and withheld in 1914 and 1915 is as follows: Of car receipt fund for 1914 and 1915, $8,425.96; of special tax fund for 1915, $8,501.72 —aggregating $16,927.68.

The park commissioners demanded that the city pass this money to their account with the commissioner of finance, to be held by him as a separate and distinct account for park purposes, but the city refused to do so, and contends that it has the right to divert this money to its sinking fund to pay its bonded indebtedness.

It should be here stated that the city has twenty-one public parks and playgrounds, and that the park commission now has outstanding purchase-money notes to the aggregate amount of $245,336.11 given to purchase land for new parks and the enlargement of old parks. This indebtedness was incurred upon the assumption and in the expectation that it would be paid out of the money derived from the two sources above

Board of Park Commissioners v. Nashville.

mentioned. The upkeep of the twenty-one parks costs a large sum. It cost the park commission itself $85,000 during the year 1915.

The city not only refuses to surrender the sum of $16,927.68 diverted in 1914 and 1915, but contends that it is now entitled to divert out of the park fund of the future the further sum of $46,658.11, on the ground that it could and should have taken that much out of the park funds which came in prior to 1914, when it did not.

The question is has the city the right to withhold the sum it has already taken and divert it to the sinking fund, and whether it has the right to take from the park funds the amount which it now proposes to take and divert for the same purpose, and to make future deductions and diversions.

We think these questions should be answered in the negative. It is no doubt true that the legislature has control over the funds of the city in all of its departments, speaking generally, and may direct their application in such manner as it may deem best for the city as an arm of the state government. The question, however, as to the fund is not one of power, but rather of construction. We are to determine what was the real purpose of the legislature, what was its meaning in respect of the matters referred to, as the same may be gathered by construction of the language quoted. Under section 27 a sinking fund is created, "into which," continues the section, "shall be paid, on the first of each month after this act becomes effective, ten

per cent. of all taxes, revenues, and collections from all sources whatsoever, except from the tax for school purposes and from any money derived from the sale of any bonds received by and coming into the city treasury.'' But by a later section, No. 39, it is made the duty of the board of commissioners of the city, in its annual levy of taxes, to make a ''special levy for park purposes, separate and distinct from its levy for ordinary municipal purposes, of a tax of not less than 'ten cents on the one hundred dollars, . . . and the amount so levied shall be collected and carried to the credit of the board of park commissioners, and shall not be diverted therefrom; and shall remain a separate and distinct park fund in the hands of the commissioner of finance, . . . all funds arising from any source which are to be devoted to, or used for the purchase, maintenance, and betterment of the public parks owned or controlled by the city shall be paid from time to time to the commissioner of finance,'' etc., ''and a separate account thereof kept. The park commission, through its proper officers, shall be authorized to draw from time to time upon said funds,'' etc.

There is no possibility of reconciling the two sections unless section 39 be construed as raising an additional exception to the imposition in favor of the sinking fund created by section 27. The propriety of this construction is supported, not only by the fact that section 39 is a later section, but also by the further consideration that it is therein provided that the spe-

cial tax shall be "not less than ten cents on the $100." If a deduction in favor of the sinking fund be granted, the special tax would be nine cents instead of ten cents on the $100. Moreover, there would be a diversion of this special fund contrary to the terms of section 39. This view is further favored by the fact that the levy for park purposes is to be "separate and distinct" from the city's levy "for ordinary municipal purposes," and that it is to "remain a separate and distinct park fund." Furthermore, the separateness of the park interests from the general life of the city in a financial sense is emphasized by the fact that the park commissioners are to serve without compensation yet they are bound by oath and bond to "devote such time and attention to the duties of their office as the efficient performance thereof may demand and require," and that among these duties is the purchase of any land that shall be needed for park purposes, for the purchase money of which section 39 says "the city of Nashville shall in no wise be responsible." The section further says that the park commissioners shall have power to execute notes or bonds for the purchase money, which means, of course, in their own name, and not in the name of the city. Accepting these great responsibilities, it was necessarily contemplated that the park commissioners should be in a position to act in the light of a certain expectation as to funds available for their use.

Now, while it is true that the language of section 27 is very broad, yet in arriving at the intention of

the legislature .we are not confined to the literal mean-
ing of words, certainly not to the literal meaning of
words in a single section when they are in conflict with
the words used in a later section devoted to a special
subject standing apart from the general subject to
which the former section is devoted. Where there is
a general provision applicable to a multitude of sub-
jects, and also a provision which is particular and ap-
plieable to one of these subjects, and inconsistent with
the general provision, it does not necessarily follow
that they are so inconsistent that they both cannot
stand. The special provision will be deemed an excep-
tion, and the general provision will be construed to
operate on all the subjects introduced therein except
the particular one which is the subject of the special
provision. 2 Lewis' Suth. Stat. Const. (2d Ed.), sec-
tion 345. Or as said in *Hayes* v. *Arrington,* 108 Tenn.,
494, 499, 68 S. W., 44, 46:

"A special provision in a statute will control a gen-
eral provision which would otherwise include that men-
tioned in the particular provision."

Furthermore, as already said, the legislative intent
will prevail over the literal meaning of the words or
terms found in an act. *Standard Oil Co.* v. *State,* 117
Tenn., 638, 100 S. W., 709, 10 L. R. A. (N. S.), 1015.
In the case just referred to this court said:

" 'The fundamental rule,' says Judge Cooper, speak-
ing for this court in the case of *Brown* v. *Hamlett,* 8
Lea, 735, 'of construction of all instruments is that
the intention shall prevail, and for this purpose the

whole of the instrument will be looked to. The real intention will always prevail over the literal use of terms. Legislative acts fall within the rule, and it has been well said that a thing which is within the letter of a statute is not within the statute unless it be within the intention of the lawmakers.' "

We have previously said that, when there is an irreconcilable conflict between two sections of a statute, the one last occurring will control. *Hightower's Lessee* v. *Wells,* 6 Yerg. (14 Tenn.), 249, 251; *Stockett* v. *Bird's Adm'r,* 18 Md., 484; *Albertson* v. *State,* 9 Neb., 429, 2 N. W., 742, 892; *Ryan* v. *State,* 5 Neb., 276; *Omaha Real Estate and Trust Co.* v. *Reiter,* 47 Neb., 592, 66 N. W., 658; *Quick* v. *White Water Township,* 7 Ind., 570; *People* v. *McClave,* 99 N. Y., 83, 89, 1 N. E., 235; Beal, Cardinal Rules of Construction, 426; Black on Int. of Laws (2d Ed.), p. 326.

With respect to the particular words of exclusion used in section 27 it is to be said that the maxim, "*Expressio unius est exclusio alterius,*" is not inflexible, and should always be applied so as to accomplish the legislative intention, and not to defeat it. *E. M. Matthews Co.* v. *Atlantic Coast Line R. R. Co.* (S. C. 1915), 86 S. E., 1069. In *Colquhoun* v. *Brooks* (1887), L. R., 19 Q. B. Div., 400, 406, Willes, J., said:

"I may observe that the method of construction summarized in the maxim, '*Expressio unius est exclusio alterius,*' is one that certainly requires to be watched. . . . The failure to make the '*expressio*' complete very often arises from accident, very often from the

fact that it never struck the draftsman that the thing supposed to be excluded needed specific mention of any kind."

In the same case, on appeal, Lopes, L. J., said:

"The maxim, *'Expressio unius exclusio alterius,'* has been pressed upon us. I agree with what was said in the court below by Willes, J., about this maxim. It is often a valuable servant, but a dangerous master to follow in the construction of statutes and documents, The *'exclusio'* is often the result of inadvertence or accident, and the maxim ought not to be applied when its application, having regard to the subject-matter to which it is to be applied, leads to inconsistency or injustice." 21 Q. B. Div., 52, 65.

We are referred to the words "all taxes, revenues, and collections from all sources whatsoever." It is said these words are so comprehensive that they cannot be limited by construction. At last, however, as we have already said, we must get the meaning of an act not alone from special words used in a single sentence or single section, but from the act taken as a whole. We must compare one section with another, and view the legislation in the light of its general purpose. For example, an act of the legislature prescribed the jury law of Franklin county. The title of the act said it was an act to provide a board of jury commissioners for counties having a certain population—not less than 20,292 nor more than 20,400. Section 19 of that act provided that "the provisions of this act will apply to all grand and petit juries in all

circuit and criminal courts of this State." Nevertheless the court said that the act was to be read as if the following words were to be added thereto: "In counties of the population herein prescribed." See *Darnell v. State*, 123 Tenn., 666, 134 S. W., 308. In *Palmer v. Express Co.*, 129 Tenn., 157, 165 S. W., 236, the act relating to shipments of liquor required the carrier to file a certain statement as to any shipment, with the county court clerk, and the clerk to file it as a "part of the files of his office;" and it also provided that a certified copy thereof should "be competent evidence in any of the courts of this State upon the trial of any cause whatsoever in which the same may be material." The court held that, when the context was considered, what was meant was not any cause whatsoever, but "any cause arising under this act."

The next question arises as to the fund derived monthly, aggregating yearly more than $40,000 from the Nashville Railway, under the compromise decree referred to. It is insisted that this was made subject to the ten per cent. deduction for the sinking fund provided for in section 27. To this contention there are two answers, each of which seems to us conclusive: Firstly, we have found that under a true construction of section 27 the park fund raised by taxation was excepted from the operation of the section. The reason for such exception no doubt is to be found in the legislative purpose to enable the park commissioners to have in view with some precision not only the amount of the fund on which they could annually depend to

enable them to discharge the very onerous duties assumed by them without compensation, but also to prevent, that fund's falling below an ascertained minimum. Having this purpose in view, we cannot doubt that the legislature, being, as we must assume, fully informed of the resources of the park commission through the avails of the compromise decree, did not intend that money poured into the coffers of the commission with one hand should be withdrawn by the other. In brief, it would convict the legislature of inconsistency if we should hold that that body, influenced by the reasons stated, excepted the tax fund devoted exclusively to park purposes from contribution to the sinking fund, and did not exempt, or did intend to subject, the commission fund devoted exclusively to the same purpose. Secondly, the compromise decree created a trust fund which cannot be diverted without violation of the contract made with the Nashville Railway under the terms of the decree. The legislature has no constitutional power, therefore to direct such diversion. This view was intimated by the court in *Wilkins* v. *Railroad,* 110 Tenn., 442, 450, 455, 75 S. W., 1026, and again in *State ex rel.* v. *Cummings,* 130 Tenn., 566, 570, *et seq.,* 172 S. W., 290, L. R. A., 1015B, 274. The conclusion is well supported by authority, as well as by reason. *City of Jacksonville* v. *Jacksonville Ry. Co.,* 67 Ill., 540, 544; *Village of Riverside* v. *Mac-Lain,* 210 Ill., 308, 328, 71 N. E., 408, 66 L. R. A., 288, 102 Am. St. Rep., 164, 177; *South Park Commissioners* v. *Montgomery Ward & Co.,* 248 Ill., 304, 93 N. E., 910,

21 Ann. Cas., 127; *Ward* v. *Field Museum*, 241 Ill., 508, 89 N. E., 731; *City of Hopkinsville* v. *Jarrett*, 156 Ky., 777, 162 S. W., 85, 50 L. R. A. (N. S.), 465; 1 Dill. Munic. Corp. (5th Ed.), section 132.

It is urged that the city secured the appropriation of the fund by surrendering its right to impose a privilege tax on the property of the railway company and its successors, and that no power existed to make this surrender. The question does not arise, since the city has made no attempt to impose such taxes, nor can it be conceived as within the bounds of probability that the city for the purpose of securing so small a tax would forfeit so great a fund as that which is annually paid by the railway company for the use of its parks. Nor can it be said that the city's participation in the creation of the trust fund in the manner just stated in any wise obliterated or even obscured the fact that the railway was a leading participant in its creation, and that it has a direct interest in its maintenance, since it serves the parks, conveying persons thereto, and thereby obtains revenue.

The last inquiry is whether the park commissioners have a right to sue. It may well be said that the question does not fairly arise; since the case is an agreed one, and the question is made for the first time in the brief filed by the city in this court. However, we think there is no merit in it. The park commission is given the power of perpetual succession, and this itself is sufficient evidence of an intention to create a corporation. Bronson, J., in *People* v. *Assessors, of the Vil-*

*lage of Watertown,* 1 Hill (N. Y.), 620. Moreover, the following additional powers are given: The power to buy real estate for park purposes; to execute notes, bonds, and mortgages for land purchased; to condemn land for park purposes; to receive "gifts, donations, and devises" of land for park purposes; to sell such land as may not be needed; to make contracts for all park improvements, to have such improvements made, and to pay therefor; to employ superintendents and subordinates; to adopt ordinances and rules to regulate the use of the parks by the public; to protect all park property; to submit an annual tax budget to the city; to draw and expend the funds appropriated for or devoted to the use of the parks. "The leading features of a corporation are that it has a continuous succession during the period prescribed for its existence, an individual name by which it may enter into contracts, and sue, and be sued, acting as a unit in respect to all matters within the scope of the purposes for which it is created, and a distinct existence or legal entity, separate and distinct from the natural persons composing it. The essential idea of a corporation is that it has the capacity to exist and act within the powers granted as a legal entity, apart from the individual or individuals who constitute its members." 1 Thomp. Corp. section 2. Corporations may be created by implication. No particular form of words is necessary to accomplish this purpose. "Where the powers given are in such language as to make a corporation in effect, it will be so declared, although not actu-

ally expressed to be so by the legislature. Whether an aggregate of individuals is a corporation is to be determined by the faculties and powers conferred on it, rather than by the name or description given to it.'' 1 Thomp. Corp., sections 157, 158; *O'Leary* v. *Fire Ins. Commissioners,* 79 Mich., 281, 44 N. W., 608, 7 L. R. A., 170, 19 Am. St. Rep., 169; *Com.* v. *West Chester R. Co.,* 3 Grant Cas. (Pa.), 200. The power to sue is one of the incidental rights of a corporation, whether mentioned in the charter or not. *Jonesboro* v. *McKee,* 2 Yerg. (10 Tenn.), 167, 170; *Doty* v. *Telephone & Telegraph Co.,* 123 Tenn., 329, 338, 339, 130 S. W., 1053, Ann. Cas., 1912C, 167; *Snow, Church & Co.* v. *Hall,* 19 Misc. Rep., 655, 44 N. Y. Supp., 427; 3 Thomp. Corp., sections 2104, 2108, 2109, 2111, 2112; 1 Morawetz on Corporations (2d Ed.), sections 356-359; Clark on Corporations, p. 114, and see page 11. It is perhaps true, however, that since the corporators in the case before us have no beneficial interest, there is no capital stock, there are no shares of stock, but the board was created solely as a means of effecting a governmental purpose, it may more properly be designated as a *quasi* corporation, like school districts, overseers, or trustees of the poor, etc., having authority to act and bring suit without regard to their membership for the time being. 1 Morawetz, Corp., section 6. If so, the result would be the same, as just intimated. *Denton* v. *Jackson,* 2 Johns. Ch. (N. Y.), 320. In a learned note to this case (1 N. Y. Ch. Rep., 394) it is said:

"The king's charter granting property to a body of men by name, or conferring certain privileges on them, has been held to make them a corporation. The words of an act of Parliament, or of our State legislature, have at least equal force with a royal grant"—citing *Thomas* v. *Dakin*, 22 Wend. (N. Y.), 9; 2 Jac. L. Dict., 94, Corp., 1; 2 Kent, Com. (3d Ed.), 276; Angell & Ames, Corp., 17; 1 Kyd, Corp., 4; Dy., 100, pl., 70; *North Hempstead* v. *Hempstead*, 1 Hopk. Chy. (N. Y.), 288; Id., 2 Wend. (N. Y.), 109; Suttons Hospital, 10 Coke, 23, 28, 30. "A supervisor of a town in discharging his duties as such is a *pro tanto* corporation. He has the capacity of suing and being sued, so far as his trust is concerned"—citing *Jansen* v. *Ostrander*, 1 Cow. (N. Y.), 670. See pages 678-680.

And see *Overseers of Pittstown* v. *Plattsburgh*, 18 Johns. (N. Y.), 418; *Jackson* v. *Hartwell*, 8 Johns. (N. Y.), 425.

"Commissioners having perpetual succession, the right to hold and enjoy property, to make and execute contracts, to prosecute and complete improvements, to levy and collect taxes from the lands of the proprietors, and to sell and convey such lands in satisfaction of such taxes, are in fact a body corporate, with the rights, powers, and obligations belonging to that class of persons"—citing *Murray* v. *Jayne*, 8 Barb., 612, 614, 615. And see specially *Fourth School Dist. in Rumford* v. *Wood*, 13 Mass., 193; also see *Thomas* v. *Dakin*, supra; Black. Com., 473. "There is an implied power in public officers to take all legal measures, in

their official character, which may be requisite to enable them to execute a trust or discharge the duty imposed on them by law, where there is no statute prescribing the means by which such trust shall be executed or duty discharged''—citing, *Cornell* v. *Guilford,* 1 Denio (N. Y.), 515; and see *Van Keuren* v. *Johnston,* 3 Denio (N. Y.), 183; *Supervisors of Galway* v. *Stimson,* 4 Hill (N. Y.), 136; *Jackson* v. *Hartwell,* 8 Johns. (N. Y.), 422. "Trustees of schools constitute *quasi* corporations, and may in their corporate character sue their own members''—citing *Connell* v. *Woodard,* 5 How. (Miss.), 665, 37 Am. Dec., 174.

And see the following cases: *Todd* v. *Birdsall,* 1 Cow. (N. Y.), 260, 13 Am. Dec., 522; *Armine* v. *Spencer,* 4 Wend. (N. Y.), 406; *Van Keuren* v. *Johnston,* 3 Denio (N. Y.), 183; *Fourth School District* v. *Wood,* supra; *Dean* v. *Davis,* 51 Cal., 406; *Clarissy* v. *Metropolitan Fire Dept.,* 7 Abb. Prac. (N. S. N. Y.), 352; *Trustees of Schools* v. *Tatman,* 13 Ill., 27; *Duntz* v. *Duntz,* 44 Barb. (N. Y.), 459; *State* v. *Hulin,* 2 Or., 306; *Horton* v. *Garrison,* 23 Barb. (N. Y.), 176; *School Dist. No. 3* v. *Macloon,* 4 Wis., 79; *Grant* v. *Fancher,* 5 Cow. (N. Y.), 309.

No error being found in the decree of the chancellor, it is in all things affirmed.